Mr. Edney, whenever you're ready. Thank you, Judge Willett, and may it please the Court, my name is Michael Edney, I represent the appellant in this matter, Mr. Timothy Barton. This case lies at the intersection of property and due process rights, both civil and criminal. A Washington administrative agency has alleged security fraud, and at the beginning of that civil case, has seized all the defendant's assets. It did so while having a sister agency, the Department of Justice, file a parallel criminal case against the defendant with the exact same charges. And it did so before discovery, before production of any documents underlying these allegations, before a trial where those allegations would be adversarially tested, and before a final judgment reflecting that the government has proven those allegations. In doing so, this administrative agency effectively ended the case before it really began, before it really had to prove anything under adversarial testing, because it deprived the defendant of the resources to defend against the government's allegations, in a complex case turning out hundreds of thousands, if not millions, of documents. All of this occurred under the auspices of the district court's equitable powers, through the imposition of a prejudgment receivership. That receivership, again, has taken everything, including evicting the defendant from his own home. What the commission left behind, the handful of companies that were left behind, they were shell companies, they had no assets, they had no bank accounts, and the recitation of this can be found at the record on appeal at 10302-06. The government does not get to take property and liberty because it says so, without being put to proof. The only protection of these constitutional principles here are the court's demanding standards for obtaining a prejudgment receivership. And they are found in this court's 2012 Netsphere case, the predecessor to the one, Your Honor, Judge Hagerbotham was on in 2015, and the previous panel decision in this case. They recognize that a prejudgment receivership is an extraordinary remedy to be exercised with the utmost caution, which cannot be used unless clearly necessary to protect property, and where there are no less drastic alternatives available. As important, the receivership is an in rem remedy. It is against specific property only. It is not in persona. It is not because the government thinks the defendant is bad, or to husband resources for eventually paying a hopeful judgment of liability. That is made clear in this court's Netsphere case, and in this court's In re Friedman litigation case at 843 F. Second, page 827. In short, the district court and the commission cannot skate beyond the property that was allegedly taken. And these principles work together. A receivership is supposed to be used as sparingly and as narrowly as possible. When it is used, it's supposed to be as narrow as possible. But the district court made it as broad as possible, scooping up far-flung companies and properties based on the very hint they had anything to do with the loan proceeds at issue in this case. Worse, the district court erred by holding it had no discretion to do otherwise, and it was implementing this court's marching orders. This court said no such thing in the first pardon case. It set forth the necessary, not the sufficient conditions for going forward, and it described what the SEC didn't show. What happened here below is that the SEC's showing was so paltry when seeking the first receivership that this court described the many things that the SEC didn't bother to show. And they said, among other things, that it didn't show tracing the property or that it benefited from property. That is not to say that once that benefit has been shown, a benefit of any kind, the property needs to be seized. That needs to be the exercise of discretion. And I will argue shortly, and we do argue in our briefs, that the benefit standard has no home in this court's precedence where the rubber hits the road on what the scope of a receivership should be. And that brings us a bit to where we have ended up in this case. This second round of receivership was not being used as a remedy against property, not as an in rem remedy. The court said the purpose was to punish the defendant. It said it again, despite concerns before this very court in the courtroom down the hall, in the first Barton case, that that purpose is inappropriate. And you can find that in the district court's second receivership order at page 14796 of the record on appeal. This follows the court quoting the Book of Ezekiel at record on appeal 2509 when seizing the defendant's son's real estate projects, saying that the sins of the father are often visited upon the son. This, Your Honor, has not just been Old Testament justice. It's pre-constitutional justice. It is putting the cart of punishment before the horse of proof and trial. That is what this court has said can't happen. All over this case, Your Honor, also is the hint that the rules are different when the government is involved, that it needs to show less, and an allegation of securities fraud changes the game. Your Honor, we respectfully submit, and this is a case that came during the briefing in this case, it's addressed in our reply brief, that position cannot be squared with the Supreme Court's decision in Starbuck Corporation v. McKinney, decided at the very end of the last Supreme Court term. There, the court held that administrative agencies have to put their pants on one leg at a time, like the rest of us, and have no special pass from the demanding standards for seeking preliminary equitable relief absent express statutory provisions to the contrary. The circuit courts throughout this country have picked up on this, and applying Starbucks has held that the SEC has no special privileges itself, and I would direct the court to the Casey v. Chappelle decision from the Third Circuit that can be found at 107 F. 4th, 114. Any previous suggestion by this court, you see a hint of it in the 2012 Netsphere case, that the SEC gets a bit of running room when it claims a corporation's violations of securities regulations have happened, can't survive Starbucks. And I would say that even that was about the situation where a corporation is having a difficult time with the shareholders or is mistreated as actual owners. That's not the situation here. This is a case where the persons at issue are lenders, they didn't own the companies, and they have absolutely no relationship, whether it's a loan relationship or an ownership relationship with the many far-flung companies that were seized here. Your Honor, there are also serious issues going to the merits of the security fraud allegations, and these are set forth in our brief. The SEC here is acting to protect lenders who are based in China, which is fine, but these lenders have never been presented in this case, and when their U.S.-based Chinese national agent initiated a bankruptcy proceeding before the SEC sued here, they were given an opportunity to show up and never did. There are serious questions about whether these lenders are legitimate, or are they instead cutouts for a Chinese Communist Party official who controls all the money. And when it came time to make payments on the loans, that same agent, who is a co-defendant in this case, Mr. Fu, instructed Mr. Barton to send those payments to U.S. bank accounts rather than the Chinese bank accounts from where they came. Mr. Barton said no. Did it raise money laundering concerns? And the Commission hasn't disputed any of this in their brief, even though it was fully set out there. This is not a case where we should step in and impose the extraordinary remedy of a receivership to take action here, because there are serious questions about what is really underlying the case. This Court should reverse. It should end the emerging trend where the SEC alleges securities fraud and seeks an immediate receivership, seizing all the assets, making it possible to defend the case. It is contrary to any concept of equity invoked to do so. It is contrary to due process protections of property inherent in our civil and criminal justice systems. And it is contrary to where the Supreme Court is going, where it says that these administrative agencies shouldn't get a special pass through the equitable process. I think one of the key things I want this Court to look at is the scope of the receivership. There shouldn't be a receivership. But the frontiers of this receivership are really quite outrageous. And I think that is really made most clear. We set out these eight errors that the District Court made throughout. But they all kind of combine in their most troubling application in the seizures of four separate apartment complexes in Texas and in Alabama. They're called Bellwether Ridge, Windmill Farms, Ingleside, and Opelika. These are the D4 companies. These apartment complexes cost hundreds of millions of dollars to build and are worth tens of millions of dollars above their secured debt today. Their construction was financed with government loans from the Department of Housing and Urban Development and third parties having absolutely nothing to do with the Chinese national lenders at issue in this case. And their construction began even before many of the Chinese national lenders were even met, much less money was taken from them. The District Court seized these properties because it held that they had benefited from lender funds. One thesis, Your Honors, was that the HUD loan applications listed the defendant's other properties in response to a question that's on the form. What other properties do you have? And what the District Court said, aha, this is a great benefit because some of those other properties they were purchased with lender funds. They were in these wall entities that brought in the loans and here we are. The defendant is getting an enormous benefit out of that. HUD is giving him all this financing because of that. But that's not how these loans are structured and we cite in the record many, many pages of the Record on Appeal, 111.069 through 133 are an example. These loans are non-recourse. It's not like, you know, Mike, if you want to, Mr. Edney, if you want to go borrow a million dollars, you're going to have to put up your house. These properties weren't put up as collateral. The only thing that HUD can do is go after the property that's being built. They want to know what other properties you have so they can determine whether there are any conflicts in the web of people that are financing all this. The government wants to know what your other properties are. But it is not about collateral or financial ability to pay. This is an internal project. And again, even if that were a benefit, that should not be the question because this is an NREM remedy. It's about chasing specific property. And when you're talking about some kind of inchoate benefit like this, you're no longer chasing property. You're doing something else. You're engaging in a consequential theory that has nothing to do with NREM. If we have a problem with a tanker ship, we can seize the tanker ship, but we can't seize all the cargo that ever was on the tanker ship, right? And that's, again, this benefit theory, it had absolutely no grounding in this court's jurisprudence or the jurisprudence of any court throughout this country until the last Barton decision. And there, the district court made a mistake. The district court said, uh-huh, I have my marching orders. This is footnote 82 of the court's opinion. If there's a benefit, if there's some property there, I have to take it. I have to put it in the receiver ship. No. What this court was describing is what the SEC didn't even bother to show, how far away it was from a relevant inquiry. It wasn't saying that benefits suffice. That's the decision that this court is going to have to reach. And it certainly wasn't saying that once there is a benefit, you must seize. You lack discretion to do it. That's a classic error under this court's precedence. There are other errors in this regard. The money came through this JMJ development entity. This is the main development entity of the defendant. In that situation, the district court just assumed that everything that came through that entity at that point was tainted. And again, this is where expert testimony needed to come in. The district court never required expert testimony from the government. And as a result, the government's witnesses never identified what method they were using to deal with commingling. This court said in the first Barton case that you can't just say commingling anymore, that you need to disaggregate these funds. And this is where expert testimony needed to come in. This is not like the United States v. Davis case on which the district court relied, the case from two or three years ago from this court, where it was a matter of simple addition and subtraction. No. This was complicated, but the expert testimony in the record, which was undisputed, said it was also possible to desegregate funds within the commons. Just one quick question as your clock is winding down. So you argue that the receipt of a small amount of lender funds is not a sufficient basis to seize an entire entity. And I guess I'm just curious about line drawing and kind of workability if we adopted a rule like that. So if receiving a small amount of lender funds is not sufficient, I mean, what is sufficient? What's sort of the tipping point? Yeah. I mean, that is an interesting question. I think it corresponds with this court's observation in Netsphere and in Barton that we have to look to less drastic alternatives, right? If there's a little bit in that company, what do we do to secure that little bit of funds? Do we take the whole thing? Well, I mean, if there's no other way to do it, perhaps, but I think we have to look at other measures. You know, if that company, let's take these apartment complexes, which I don't think have any funds at all, but if they were to have them, that company could, if somebody wanted to press the issue, that company could easily pay them back. There's not necessary. And Judge Starr looked at, and you may be unconvinced, but he looked at less drastic measures short of what he did and just found those to be inadequate. Yes, he did. And I think that that analysis was error itself. But error, garden variety error, and abuse of discretion are two different things. Well, that is true, but abuse of discretion is not a license to make mistakes, right? I think it is abuse of discretion to use the wrong legal content of a legal standard. And I think that's the situation where we have here. When he says less drastic measures wouldn't work and spends a page on it, that's not the kind of searching review that this court was encouraging district courts to do in that sphere when they said that this was an extraordinary remedy that needed to be imposed with the utmost caution. Okay. Mr. Redney, we'll see you back on rebuttal here in a few. Thank you, Your Honor. Thank you. Thank you. Mr. Hill from the SEC, welcome. Thank you, Your Honor. May it please the Court, Ezekiel Hill for the Securities and Exchange Commission. I'd like to begin, unless the Court has a specific place that it would like me to begin with, responding to some of the comments that Mr. Redney just made. First of all, he began by saying that the purpose of this receivership was to punish the defendant. That's clearly not the case based on the entire record before this Court and what the district court did. The district court very clearly followed this Court's instructions on remand from when this case was previously before this Court and applied net sphere in the earlier decision. In Barton, in this case, it found a receivership was warranted not to punish the defendant, but because it was clearly necessary to protect the allegedly defrauded investor's interest in property, because legal and less drastic equitable remedies were inadequate, and because the benefits of the receivership outweigh the burdens on affected parties. And Mr. Redney referred to a particular provision in the receivership order on page 14,796 of the record, which is simply language referring to the fact that the bankruptcy say should, in relevant part, be lifted to permit the receivership to move forward. That's not demonstrative of the district court's desire to punish the defendant. Mr. Redney also referred to the receivership here as being a violation of constitutional rights or of pre-constitutional rights. He's raised no specific constitutional argument before the district court on appeal as to the propriety of the receivership. Mr. Redney also addressed the Starbucks case the Supreme Court decided last year and indicated that it provides as no special pass for agencies. Now here the district court applied two different standards in assessing whether a preliminary injunction here, in particular an asset freeze, was warranted. It applied this Court's decision from first financial, and it also applied the traditional four-factor test. Are we required to apply Starbucks in this case? Well, Your Honor, I don't know that this Court needs to address that question because in this instance the district court found both standards were satisfied. But if Your Honor's question is what standard should this Court apply in this context going forward, I believe Starbucks would be the correct standard. And it was applied here, albeit not under the name Starbucks because that decision had not been reached by the Supreme Court, but this Court applied the traditional four-factor test for preliminary injunction and concluded that the commission had demonstrated a likelihood of success on the merits, that there would be irreparable harm without the asset freeze, the balance of the equities favored, the asset freeze. And if we do follow Starbucks and apply the winner factors, what role does first financial play? I'm sorry, what role does first financial play? Right. Your Honor, it may be that first financial standard for preliminary injunction, if this Court is going to be applying Starbucks, is no longer good law. I'm not suggesting this Court has made that decision to date, but if the Court's going to be choosing at this point in time between Starbucks and first financial for a preliminary injunction in these circumstances, then Starbucks is obviously urging a different standard than first financial is. Mr. Redney also described that district court is failing to exercise discretion in deciding the scope of the receivership, and that's simply not the case examining the record. The commission proposed for inclusion in the receivership 28 entities that the district court concluded could be preserved with equitable remedies short of a receivership, and so it placed an asset freeze on those remedies. So this is not simply an instance in which a plaintiff presented the court with a list of entities and said, place these in a receivership, and the court complied without exercising discretion. To the contrary, nearly a third of the entities proposed for inclusion in the receivership were not included in the receivership by the district court. Mr. Redney also referred to a hearing, I'm not sure what hearing he was referring to, at which the investors did not attend. I'm not sure what bearing that has on the merit of the commission's case or of the district court's decisions with respect to the receivership or the preliminary injunction, but certainly in connection with the receivership order and the preliminary injunction, the district court concluded that the commission was likely to succeed on its case, and it found, and this was on page 14,824 of the record, significant record evidence of violations of the federal I'd like to then turn, if I may, to the, I'll refer to them as the high department complexes that Mr. Edney was discussing, and here the commission applied the standard that this court, excuse me, the district court applied a standard that this court put forth in Barton, which was entities could be included in the receivership to the extent that they received or benefited from investor funds, and I believe Mr. Edney's reading of that would be to eliminate the benefited from or severely constrain the benefited from component of that test without any basis in this court's recent decision in Barton or in the Netsphere decision underlying that, but I'd also like to explain a little bit more because the district court went through a detailed analysis of every single entity that was included in the receivership. These department complexes were obtained using assets that were purchased with or benefited from investor funds, and this is described in the declaration by the receiver put forth in connection with the motion for receivership, page 10,265 of the record. The form was the HUD personal financial and credit statement, and when that form was completed by Mr. Barton, he included properties that had benefited from investor funds to demonstrate his financial or creditworthy status for purposes of obtaining the HUD loans, and the evidence before the district court, both in the receiver's declaration and his testimony at the hearing that was held before the receivership was put in place, was that without those HUD loans, without making use of those properties that benefited from investor loans, Mr. Barton would not have received those loans, and the apartment complexes would not have been built, but that is not the only way in which the district court found that these HUD apartments had benefited from investor funds. They also, as the district court described in the receivership order, benefit in the form of investor funds being used to pay for offices and labor for the development of all four of those apartment complexes. The record evidence is that without investor funds paying those costs, those employees would not have been doing that work, and the HUD developments would not have occurred. And beyond those benefits from investor funds, also three of the four entities that constructed the HUD apartments received investor funds directly. You and Mr. Edney certainly disagree on kind of the complexity of the tracing that's required to figure out, determine which entities ought to be replaced, ought to be placed in receivership. Do you disagree that there were other methodologies that would have traced the funds in a more targeted or precise way? So, Your Honor, the work undertaken by the commissioned staff accountant here and by the receiver and the receiver's accountant was much simpler than what Your Honor may be thinking of as a tracing exercise, trying to discover where every dollar went at a particular point in time. And as the receiver described in his testimony, in his declaration, that was because satisfying this Court's standard in Barton doesn't require demonstrating exactly, you know, how many dollars went to an entity beyond the simple fact that it benefited. And as a practical matter, the receiver explained to the district court, it would be an inordinately expensive undertaking to track where every single dollar went. I mean, certainly the examples in your brief seem pretty straightforward. But you look at the record, we had a citation earlier, page 14,000, whatever, of the record. If you look at this voluminous record, you look at the number of entities involved, you look at the amount of money moving around, it doesn't seem so straightforward. Well, Your Honor, I appreciate your point about how voluminous the record is. You know, part of this is because Mr. Barton structured his business in a way with 160 odd entities. But with respect to the actual exercise that the accountants went through, it was simply tracing funds into an account and then out of an account. It was not trying to determine whether, what percentage of funds from investor funds went to a specific entity. It was just, did investor funds go to that entity, and putting a dollar amount on it. And so Mr. Barton's own expert, his testimony at the district court, at the receiver, admitted or conceded that what he described as actual tracing, which was not kind of this after-the-fact determining what percentage of funds in an account had come from Entity X and what had come from Entity Y, but simply looking at a bank statement and tracing, okay, this $40,000 came in on June 19th, $40,000 left on June 20th, that that exercise did not require expertise and did not require the kind of complicated tracing techniques that are required when you don't have the kind of bank statements providing the road map for the in-and-out funds. If you would, explain briefly why the testimony of the SEC's non-CPA accountant, why that is sufficient testimony for tracing. Well, yes, Your Honor. That witness was not appearing as an expert witness. She was appearing as a summary witness and was providing the court with an overview of her declarations that she submitted in support of the receivership motion, and she explained in her testimony that it was essentially a matter of addition and subtraction. She was not engaging in some sort of gap analysis of these entities, but it was simply looking at bank records, and these are bank records that are in part attached to her declarations, but there's also examples attached to the receiver's declaration in which they're simply watching money move into a bank account and then move out that day or the following day and determining that, yes, these are investor funds coming in, and they went to this entity, and that's . . . we're not . . . there's no representation about what percentage of funds are going in or anything of the sort. It simply did this entity benefit from investor funds, and that allowed the district court then, under this Court's decision in Barton, to determine this is an entity that has received or otherwise benefited from investor funds, is it properly included in the receivership, and the district court exercised its discretion to make those determinations. I guess we'd like to then turn to Your Honor's question before that posed to Mr. Edney about a small amount and drawing a line there. Now, first of all, as I mentioned earlier, I don't believe that specific question is posed by this appeal, because Mr. Barton's argument regarding a small amount refers to the HUD apartment buildings, and as I mentioned a minute ago, there were a multitude of ways in which the district court concluded that they had benefited, not least of all, the use of investor funds to obtain the loans from HUD to build those apartment complexes. But again, I agree with, I believe, Your Honor's intuition that you mentioned with Mr. Edney is that this involves the district court's discretion as well. There's simply not a need for a line-drawing exercise here. The question is whether this was in the district court's discretion, and this Court's decision in Barton and this Court's decision in Netsphere emphasized also that with respect to the inclusion of a receivership in the, or an entity in the receivership, the court is concerned about things like, is there a way to preserve value for investors short of this drastic remedy? And it is a drastic remedy, and the district court here was certainly cognizant of that, and as I referred to earlier, concluded that with respect to almost a third of the entities put forth by the Commission, there was a way to maintain value for investors without receivership. Beyond that, I would also mention with respect to kind of specific entities that are being placed in the receivership, some of the considerations the district court had here was not simply, you know, so much money went in, but also now that we know this entity has benefited, how can we protect it for investors should the Commission prevail in the enforcement action? And these are complicated entities in that it's not simply money sitting in a bank account. These are entities that are in some cases, you know, running a hotel, and so simply freezing the assets of an entity that's operating a hotel is not going to work. It requires active management. And so you'll see from the receiver's testimony and declaration, et cetera, that the receiver has to do things like replace air conditioning units, make sure the grass is mowed, make sure insurance is paid on these entities, and so that requires the active management that a receivership provides. Moreover, almost every entity, I believe all but one entity in the receivership, faces significant debt, and so as the receiver described and as the district court described in its decisions below, these entities face lawsuits and foreclosure. And it is only because of receivership in place that these entities have not been, that those suits against the entities have not gone forward and that they haven't been subject to foreclosure proceedings at this point in time. Okay. If there's no further questions, I'll stop there. Very good. Mr. Hill, thank you very much. Thank you. All right, Mr. Edney, you're back on rebuttal. I think, Your Honor, perhaps I should start with a more thoughtful answer to your question that we, that I left with. What do we do with the small amount problem? And I would say this. I don't think that this Court is confronted with a situation where, well, it's 50 percent of the assets inside the corporation and off, or 75 percent, because we're way far away from that in terms of the apartments. We're also dealing with assets that are real estate, right? So I think the scope question in terms of the receivership remedy, I used to think of it as two separate questions, should we have a receivership and then what is the scope? I think they're kind of combined, right? I think what this Court was telling us and what was protecting the constitutional rights in NetSphere with regard to the, are there less restrictive measures, goes to the scope of the remedy, too, right? Because if there is a small amount of property inside a corporation, is it, is the least drastic measure to seize the whole corporation or is it to take some lesser action to secure that quantum of property, because that's the only thing you have jurisdiction over. You don't have jurisdiction over the whole company. It's not like once it has a drop, you get the whole company. You have, it's to protect that property. So this is real estate, right? Real estate doesn't go anywhere unless you sell it, right? It's either there and you own it or it's not there, you sell it, and frequently, all sorts of people put a lot of that, but what do you ask this Court to do? What am I asking the Court to do? I'm asking the Court to reverse and vacate the receivership order. The receivership was not needed, did not meet the high standards under NetSphere. In the event that this Court has problems with the scope of the receivership but believes that the receivership of some sort could be justified, this, we've, this has been going on for three years. We have a criminal trial in this case in September. We think that the right result is that the Court should vacate the receivership as to all of the companies except for those companies that receive the lender funds directly, that borrow the money. These are the wall entities. There's 18 of them, and their parent company, Carnegie Development, LLC. That's the halfway house remedy that we asked for in our brief, and I think that's what has to happen here. We cannot have this spin cycle where the SEC wins by losing, right? Where this property is tied up until Mr. Barton has to go to criminal trial just because we can't do the work that the SEC should have done years ago to figure out what property is, should be in the receivership. That's the remedy we're urging on the Court. But going back to the point . . . Then what do you see as the purpose of the, of the, of the receivership then? I mean, you say there's no, basically you're saying there's no further need for a receivership. We shouldn't have had one in the first place. This is not, this is not the Stanford case. It's not bearer funds and securities. You're saying we never did. And your argument ultimately is that they never should have had a receivership. Yes. But if we were going to have one, it should never have extended to everything the defendant owns that has any assets. And that's what happened, right? But make no mistake, the Commission left nothing out of the second receivership if it has any money. The alternative argument then, where do we trim? I'm sorry. I didn't catch that one. Welcome to New Orleans. I said, well, on the other hand, on the other hand, if we're going to have some, then what? If we're going to have one and the court thinks that the district court did an error in deciding that some receivership was appropriate but erred on scope, it should vacate the receivership for all of the defendant's companies except for the wall entities. These are the companies that actually borrowed the funds. What metric do you, do you decide what's in and what's out? A receivership. Well, I think the metric needs to be that a company that is in the receivership today has to possess substantial amounts of lender funds of the race at issue. I think that's got to be the standard. And I don't think that the SEC has shown that and the district court didn't find it in any way that wasn't erroneous with regard to the vast majority of these companies. There's a lot of money here and a whole other place, but what, you'd say, well, it's a substantial amount. How would you administer that? Well, again... Some people say it's substantial and it means one thing and... Right. Here the district court said one drop, you know, one drop of food coloring in the glass turns the whole glass red, right? This is footnote 82. He said, I have my marching orders from the fifth circuit. I have no discretion. If it has any lender fund, if it has received any benefit from the lender funds, I need to seize it and put it in the receivership. That's error, right? So I guess the question is, what's a substantial amount? I think in this context, with real estate assets, there's all sorts of lesser measures than a receivership where you can secure the quantum, less than half, of the company's funds that, through less drastic measures like a lien or an injunction against sale without paying that quantum back to the entity from which it was borrowed. I think that's... I think it's actually much easier to administer here than an operating entity that's making widgets. But if you have no receivership, what happens? What's the play out of that? Well, the play out of that is that the companies revert to the defendant's control, that the real estate projects that have been sold, that have been sold for years at this point, because we have a receiver that is not a real estate developer. Keep in mind, the SEC proposed a receiver that had a real estate developer, and the district court judge rejected that person and chose one of his acquaintances, a litigator, to run this receivership. So those real estate projects that were designed to create returns for everybody, including the ability to pay back some of these lender funds, they've been stalled for years. And that is a tragedy of this receivership, is why this receivership, its costs outweigh its benefits. But yes, it would revert to the defendant's control, and then other measures could be put in place, like an injunction on sale or an injunction on certain transactions that would address any issue of asset flight. I think that the SEC hasn't come close to making the showing that a receivership is necessary to prevent asset flight. On sales, that presupposes that you have some monitoring of sales. How do you monitor something without—when you turn away your receivership, it frees people to act, and businessmen are going to act. I guess one of the— I don't know. The SEC says it's one of the problems. I think one of the opportunities or virtues of this situation is that the entities here aren't sitting on a lot of cash, right, where you hit a button and transfer it to the Cayman Islands, right? Instead, they're sitting on real estate interests. You can't sell real estate in Texas or anywhere else in this country without making an awful lot of noise, right? You have to go record your sale. You have to—there's a lot of windup. Title companies are involved. Putting an injunction down on transactions that stop those sales, unless certain conditions are met, that's plenty protective of property, this situation, and doesn't strip ownership rights in a way that is constitutionally offensive. And I think my brother counsel— Who's going to bring the injunction out? This would block the sale. The parties to the sale aren't going to sue. So who's going to bring the action to stop it or to get reviewed? Well, the SEC is very good at—once it obtains the injunction. Basically, you're saying, well, we don't have a receivership, but the SEC has got to be an awfully sharp hawk to keep flying over all these things and swooping down and stopping this transaction and allowing that to go. That sounds to me like close to a receivership. Well, the agency is the one that wants all the property, right? So, I mean, if it obtained an injunction against certain transactions, it would be there to both monitor whether those transactions were happening through the recorder's offices where these properties are placed, and to stop them if the injunction is so provided. Right? That is a traditional and less drastic remedy than stopping all these projects and stripping an owner of his long-time ownership of these properties. All right, Mr. Edney. Appreciate it. We have your argument. If I might just add one more thing, right? You're like Columbo. Oh, one more thing. One more thing. One more thing. One more thing. Just a few seconds. Wrap it up. Yes, Your Honor. So, the securities issue, this district court judge never determined that these things were securities. We made extensive arguments on below, and I would ask the court, I would ask the court to look at pages 70 through 71 and pages 73 of the Record on Appeal. There, the SEC is saying these loans were for specific properties, and the fraud was using them for other things. Revis and the other securities cases say, well, if you want a loan to be a security, it needs to be for general business use. We will look at it. Look at it, Your Honor. We will look at it. Thank you, Your Honor. We appreciate the arguments of counsel. I'm sorry we didn't have a bigger question.